## APPLEY *vs.* THE TRUSTEES OF MONTAUK.

The act of the legislature of April 2, 1852, to incorporate the proprietors of Montauk lands, in the town of East Hampton, in Suffolk county, does not vest the trustees with the title, or give them the possession, of the lands. Nor does it empower the trustees to sell the grass or herbage growing thereon, or to enter into contracts of agistment, which shall bind the corporation.

And where, in an action against the trustees, as bailees or agisters, to recover the value of a horse which had been pastured on the common lands, and was alleged to have been mired and killed in consequence of the carelessness

and negligence of the defendants, it appeared that the trustees had no rights of pasturage to sell or dispose of, and no right to enter into any contract in regard thereto; and that the contract for the pasturage was made not with them, but with the owners of the pasture rights in the land; it was *held* the action would not lie against the trustees.

THIS was an action brought by the plaintiff to recover the value of a mare, which the complaint alleged that the plaintiff placed with the defendants to pasture, and which was mired and lost, through their carelessness and neglect. 'The action was tried at the Suffolk circuit, before a jury, in June, 1861. At the close of the testimony, on the part of the plaintiff, the defendants moved for a nonsuit, on the ground that the action should be brought against the person from whom the plaintiff hired his right; that the contract was between them; that the proprietors were tenants in common, and that the trustees did not receive any consideration for such hiring; that the act of incorporation was merely to regulate the right of pasturage as between themselves, and did not divest the owners of their title; that no relation of master and servant existed between the trustees and keepers. The counsel for the plaintiff contended that though by the act of incorporation the title of the proprietors remained undisputed, yet the exclusive control and management of the land, and the entire care and custody of the cattle, was vested in the trustees. That the trustees, having the sole and exclusive control, were the only parties responsible for neglect and carelessness; that the mare and horse were received by the authorized agent of the trustees, and the money paid to and received by him; that what disposition he made of such money was of no consequence to a stranger, nor could any arrangement between the proprietors, as to a division of the pasture money, affect his rights; that, even admitting that Appley was told upon whose rights his beasts were to be turned, this fact raised no contract; that the fact of such telling, though sworn to by Stratton, was denied by Appley, and there being therefore evidence on both sides of the case,

the case should go to the jury; that were he to sue Dayton, Osborn and Baker, the proprietors owning the rights, he could not recover: 1st. Because, by the act, they were excluded from all care of the cattle. 2d. Because it would be impossible to tell upon which share the mare died; and finally, that at all events there was evidence on both sides, and the cause should therefore be left to the jury. The motion for a nonsuit was granted, to which ruling, and each and every part thereof, the counsel for the plaintiff excepted. It was ordered, that the exceptions taken be argued, in the first instance, at general term, and that forty days be allowed the defendant to make and serve a case, and that in the mean time all further proceedings on the part of the defendants be stayed.

*Slosson, Hutchins & Fellows*, for the plaintiff.

*Miller & Tuthill* for the defendants.

*By the Court*, BROWN, J. The plaintiff in his complaint alleges that the defendants are a body corporate, duly incorporated by the act of the legislature of the state of New York, passed April 2, 1852, and as such corporation are seised and possessed of a large tract of undivided lands situate in Montauk, town of East Hampton, Suffolk county, which they employ in pasturing, for a suitable compensation, the cattle, horses, sheep and other animals of such persons as apply for that purpose. He then alleges that on the 20th of July, 1858, he was the owner of a valuable mare called the Prairie Queen, and entered into a contract with the defendants to take the mare into their keeping, and provide her with good and sufficient pasture, and to exercise reasonable care and supervision over her while in their keeping, for a reasonable compensation to be paid by him to them therefor. That in pursuance of the agreement the mare was delivered to the defendants, who received her into their possession to be pas-

tured and cared for, as before mentioned. He further alleges, that through the carelessness, negligence and mismanagement of the defendants the mare strayed into and became mired and entangled in a dangerous marsh and morass, and there being unable to extricate herself died, and claims damages in the sum of $5000. The answer denied all the material allegations of the complaint, except the incorporation of the defendants.

By reference to the act of the 2d April, 1852, to incorporate the proprietors of Montauk lands, in the town of East Hampton in Suffolk county, it will be seen that its provisions are quite narrow, and limited to a very few objects. The trustees are not vested with the title to the lands, and if they have any possession whatever, it is nominal and not actual. The 1st section creates and names the corporation, and provides for seven trustees, to be known as the Trustees of Montauk. Section 2 provides for annual meetings of the proprietors of the common lands of Montauk, and gives a majority of them power " to make such rules and regulations for improving, managing, governing and using such lands as they may deem proper." These rules and regulations relate to the management and use of the lands by the proprietors or tenants in common themselves, and not by the seven trustees, for the benefit of the proprietors. It provides for the election of the trustees, and defines the qualifications of the voters. Section 4 declares the trustees shall have the superintendence of the lands, with power to make rules and regulations for managing, governing, using and improving the same, but they are not to contravene the rules and regulations made by the proprietors themselves. By section 5 the trustees have authority to maintain actions for injuries to the proprietors, whether by trespass on their lands, breaches of the by-laws, or breach of any contract. And section 6 declares it unlawful for any proprietor to cut or carry away from such lands any wood, timber, grass or other produce, or to plow, plant, or sow, or in any other way to use the lands, otherwise

than in conformity with the rules and regulations established by the proprietors and the trustees. And the trustees are also to be bound by such rules and regulations. These are substantially all the provisions of the act of incorporation. They do not vest the trustees with the title, or give them the possession of the lands. Nor do they empower the trustees to sell the grass or herbage growing thereon, or to enter into contracts of agistment which shall bind the corporation, such as is set up in the complaint in this action. The main purpose of the act is to regulate the manner in which the proprietors or tenants shall enjoy the use of their respective shares in the lands. Its purpose is that of internal government, and is designed to insure to each proprietor the use of his share in the lands, and not to deal in the name of the corporation with persons outside of the proprietors or tenants in common. The plaintiff offered no proof, upon the trial, tending to show the state of the title or the occupation, or that the trustees were vested with any authority to enter into the contract under which he claims to have put his mare upon the lands where she was injured.

The proof, however, obtained from his own witnesses, principally on their cross-examination, established that the lands consist of about 9000 acres, held by 125 owners as tenants in common, and divided into five fields. The first is known as the hither woods, four miles in length and two in breadth. The next, called the north neck, on the east side of Fort pond, said to contain 1800 acres. The next, called "between the ponds," and these are called outside fields. There are two fields, "East Indian field," and "Point field"—fatting field. The rights of the proprietors are designated by pounds, shillings and pence. Five pounds constitutes a right which entitles the owner to put upon the lands six cattle, or three horses, and so on in the same proportion. A share is forty pounds. It was admitted that Sidney H. Stratton, George Osborne and Patrick T. Gould were at the time the mare was put upon the lands to pasture, and had been for nine years

previous thereto, the keepers of Montauk, regularly appointed by the defendants. The duties of these keepers is expressed in the trustees' book of minutes, in the following terms : " to take the general care of the stock on the land, to keep the fences. To keep all cattle and horses in the fatting field that should be in, and all out that should be out, through the season, and to get out all cattle and horses they may find in the mire and take care of them." Jacob A. Appley, the plaintiff, testified that he applied for pasture to Stratton, one of the keepers. Stratton, he said, " told me there would be a vacancy and he would get it for me. He did so. I applied for pasturage for two horses ; think he sent me word of the vacancies, and I turned on two horses. About July 20th, 1858, sent on the two horses." He also testified that he paid $4 for the pasturage of the two horses, and afterwards found the mare dead in a marsh or morass into which she had strayed and died. That the horses were to be pastured for the season. The plaintiff then called Harvey P. Hodges, who testified that the book which he produced was called the list book. It contains the amount of interest each proprietor has in the Montauk lands ; the number of cattle, sheep and horses he is entitled to turn upon his right ; the number of cattle, sheep and horses turned on, and in whose right. The book is kept by the clerk of the trustees of Montauk, and is left with the keeper to enter cattle that go on after the first of the season. Prior to that period the clerk makes the entries, and afterwards the keeper who lives at the first house, Montauk. The horses of Appley were entered, as appeared by the book, upon the right of Jeremiah Dayton, which was a horse right, and the rights of Sylvanus M. Osborne and Edward Baker, which were cattle rights, two cattle rights being equivalent to one horse right. The witness further testified, that the amount which each man is entitled to turn on is ascertained by the clerk, and he makes up his book every year. Persons who have no rights may turn them on by hiring of those who have the rights ; in no

other way. The trustees have no fields which are appropriated to the cattle of those who are not proprietors. The trustees, as such, have no right to turn on any cattle. They must be proprietors. The trustees receive no compensation for any cattle turned on Montauk lands. Cattle are never received by virtue of any contract made with the trustees. The compensation paid for pasturage always goes to the owner of the right on which the animal is put. Samuel Stratton, called by the plaintiff as a witness to prove the loss of the mare, testified, on his cross-examination, "Appley did not agree with me about his mare going in Montauk. I got rights for him. He spoke to me, and I told him I knew of some vacant rights, and would send off to see whether he could have them. My brother went off and got them. Appley came to my house and I told him my brother had engaged those rights, and he might turn his horses on. I told him of whom I had engaged those rights. I told Appley that Sylvanus Osborne had a one horse right. I got one beast right of Jeremiah Dayton and another of Edward Baker. I don't know whether they owned them. I received the money from Appley for those rights, and paid it to the men from whom the rights were obtained." This testimony came from the plaintiff's witnesses. It was not contradicted, or its force modified in any way. The facts that it established were the undisputed facts of the case, and they are to determine the plaintiff's right to recover in the action. They show that the trustees had no rights of pasturage in the lands to sell or dispose of in any way, and no right whatever to enter into any contract in regard thereto. They also prove that the plaintiff made no contract with the trustees. That they did not receive his mare into their custody, and consequently were not bailees of his property, and owed him no duty or obligation in regard to the care thereof. His contract, such as it was, was with Osborne, Dayton and Baker, and if there is any responsibility upon the contract for the loss of the mare, they are the persons to answer. When the

evidence for the plaintiff was closed, he had failed to prove all the material facts set up in his complaint, except the loss of the mare in the morass.    There was no ground upon which he could claim a verdict, and he was nonsuited.

Various questions upon the admissibility of evidence were raised upon the trial, which I decline to consider, because in no aspect of the case do I think the plaintiff entitled to recover in the action.

Judgment upon the nonsuit should be entered for the defendant.

[ORANGE GENERAL TERM, September 8, 1862.  *Emott, Brown, Scrugham* and *Lott,* Justices.]